**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 10-20896-CR-LENARD/O'SULLIVAN

**UNITED STATES OF AMERICA**,

v.

**QUARTAVIOUS DAVIS**,

    Defendant.
_____/

**ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE (D.E. 208), DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (D.E. 125), AND DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE (D.E. 126)**

**THIS CAUSE** is before the Court on Defendant Quartavious Davis's Motion to Suppress Statements (D.E. 125) and Motion to Suppress Physical Evidence (D.E. 126), both filed on June 1, 2011. The Government filed its Responses in Opposition to Defendant's Motions (D.E. 142, 143) on June 24, 2011. No replies were filed. The Court referred Defendant's Motions to Magistrate Judge John J. O'Sullivan (D.E. 130). After holding a suppression hearing on the Motions on August 19, 2011 and August 23, 2011, the Magistrate Judge issued his Report and Recommendation ("Report," D.E. 208) on September 30, 2011, wherein he recommended that Defendant's Motions be denied. Defendant filed his Objections to the Report (D.E. 227) on November 7, 2011, to which the Government filed its Response (D.E. 229) on November 16, 2011. Having considered the Report, the Motions, the Responses, the Objections, the Response to Objections, and the record, the Court finds

as follows.

I.     Background[1]

This case involves two robberies and six defendants. On September 25, 2010, four individuals robbed two businesses in a strip mall in Miami-Dade County, Florida. Police located the getaway vehicle and recovered from it a tee-shirt that a victim identified as worn by one of the robbers during the robbery. Police obtained a DNA profile from the tee-shirt. Police located the owner of the vehicle, who stated she lent the vehicle to her boyfriend, Jahmal Martin, a co-defendant in this case, and that Jahmal Martin was in contact with Jamarquis Reid and Willie Smith, who are also co-defendants in this case. Police interviewed Reid and Smith, who stated that they had committed the robberies and Jahmal Martin was the driver of the getaway vehicle. They did not identify the fourth robbery suspect. Police determined that the DNA from the tee-shirt did not match the DNA of Jahmal Martin, Reid, or Smith.

On October 1, 2010, four individuals robbed a jewelry store in Broward County, Florida. A surveillance camera recorded the robbery. Two of the robbers used sledgehammers to break glass casings, and they left bloodstains inside the store. Police also found bloodstains on the backseat of the BMW that the robbers used as a getaway vehicle. Police obtained DNA profiles from the bloodstains in the store and the BMW, and police determined that one of the bloodstains recovered from the BMW may belong to Michael

---

[1] A more extensive recitation of the background facts is contained in the Magistrate Judge's Report. (See Report, 4-11.)

Martin, a co-defendant in this case. The second DNA profile obtained from the bloodstains matched the DNA profile obtained from the tee-shirt from the September 25, 2010 strip mall robberies.

Police interviewed Michael Martin, who stated that he was involved in the jewelry store robbery along with Reid, Sylvester Fisher, and Davis, and he further stated that Davis carried a sledgehammer when he entered the jewelry store. Police showed Michael Martin surveillance video from the jewelry store robbery, and he identified Davis as one of the four individuals on the video. As identified as Michael Martin, the video shows Davis breaking glass casings with the sledgehammer and also shows Michael Martin and Davis getting into the backseat of the BMW.

Based on Michael Martin's statement, Davis was arrested and taken to an interview room at the Broward Sheriff's Office, where Detectives Fred Anderson, Mark Copley, and Jose de la Paz interviewed Davis for three hours and eighteen minutes, including breaks.[2] In response to questions from the detectives, Davis told them that he was nineteen years old and that he had not completed high school. (See Transcript, D.E. 183-1, at 2:2-33, 6:2-3, Dec. 23, 2010.) Detective Anderson then asked Davis if he would speak to them without an attorney present, and Davis replied, "Nope."[3] (Id. at 13:7-9) Despite Davis's refusal, the

---

[2] The interview was video recorded, and the Magistrate Judge has watched the video.

[3] Davis stated on three other occasions during the interview that he did not wish to speak with the detectives. (See Transcript, D.E. 183-1, at 69:13-16, 80:16-17, 93:1.) The detectives did not stop the interview.

3

detectives proceeded with the interview without an attorney present. During the interview, Detective de la Paz said the following to Davis regarding Davis's possible sentence upon conviction:

> That's fine but at the end of the day know that whatever happens if you want to be tough and let's say for example it's 25 years if it's 50 I don't know because I ain't the judge and I don't predict that so I'd be blowing smoke up your ass if I told you it was 25 or 50 but I guarantee you it ain't going to be less than 25.

(Id. at 82:15-20.) Later in the interview, Detective Anderson said the following to Davis:

> You know that. You knew that Quat come on now keep it 100. Keep it 100 you knew that. Ain't no doubt about it that you knew that. You knew it. Why you trying to protect them? I don't know. Why you trying to be hard? I don't know but man it's going to bust you right across the head man and you going to <u>you know when it's going to hit you? When your sitting in prison ok and your roommate has been to prison 4 times over and he getting ready to punk your ass out</u>. Then you going to be like God dammit it I could have just been sitting at home probably if I would have just laid it all out. Why you trying to protect these guys.

(Id. at 91:26-92:3 (emphasis added).) At the suppression hearing, Detective Anderson testified that the phrase "punk your ass out" meant that Davis would have to make certain concessions to his cell mate, such as giving up his lunch or telephone time.[4] (Transcript, D.E. 205, at 61:10-22, Aug. 23, 2011.) Davis testified that he thought the phrase meant that

---

[4] Specifically, Detective Anderson testified as follows:

What I meant by that is that the time his cell mate has been in there, and him being new and never being in prison, that what was going to happen is that he was going to get punked out to give up his commissary, give up his lunch, give up his phone time, to actually be catered to that particular person that is in there, the cell mate.

(Transcript, D.E. 205, 61:17-22.)

4

if he went to prison, he would be anally raped by his cell mate.[5]  (Id. at 176:4-13.)

During the interview, Davis was asked numerous times to provide a DNA sample, and Davis refused each time. (Transcript, D.E. 183-1, at 30:28-30, 33:3-4, 34:32-35:1, 39:15-16, 79:17-19, 87:27-28, 88:12-16.)  Detective Copley told Davis that if he did not consent to providing a DNA sample, the detectives would get a search warrant for his DNA.[6]  (See id. at 35:2-5.)  At one point during the interview, Davis revealed that his mother called him the nickname, "Boobi," and then Detective Anderson told Davis that if his mother was present, "She would say Boobi if you weren't in that car what do you have to hide with giving your DNA if it's going to eliminate you from the case?"  (Id. at 36:18-37:1.)  Davis again refused to provide a DNA sample.  (See id. at 37:2.)  The detectives also asked Davis multiple times whether they could photograph his hand, and Davis refused each time.  (See id. at 68:9-15, 79:17-19, 87:9-28.)  Toward the end of the interview, Davis indicated that he did not wish to talk to the detectives and asked to be taken to the jail.  (See id. at 92:20-93:1.)  The detectives agreed to take Davis to jail while they obtained a search warrant for his DNA and ended the interview.  (See id. at 93:8-21.)

After the conclusion of the interview, Davis was taken to a large open area of the

---

[5] In addition, Davis testified that in November 2010, a police officer called his girlfriend and told her that when Davis went to prison he "was going to be somebody's bitch," and once he returned from prison, she would not want to be in a relationship with him anymore because he "was going to be liking guys." (Transcript, D.E. 205, at 168:7-14.)

[6] Specifically, after Davis refused to provide a DNA sample, Detective Copley stated, "Ok. It doesn't matter because what we'll do later on is we'll just get a search warrant. And we'll get it that way so know either way we either do it now or do it later." (Transcript, D.E. 183-1, at 35:2-5.)

5

robbery unit, where he was sat in a chair near the desk of Sergeant Edward McCardle. The detectives told Sergeant McCardle that Davis had not submitted his DNA, and the detectives returned to their desks to prepare the paperwork to transfer Davis to the Broward County Jail. Sergeant McCardle told Davis that if he provided a DNA sample, it could clear his name, but Davis did not respond. Approximately twenty-five to thirty minutes later, Sergeant McCardle again asked Davis if he would provide a DNA sample, and Davis agreed to provide a DNA sample. After Sergeant McCardle told Detectives Copley and Anderson that Davis agreed to provide a DNA sample, one of the detectives obtained an audio recording device and then read the Consent to Provide DNA Sample for Lab Analysis form to Davis. Davis, Detective Anderson, and Detective Copley all signed the consent form. After Davis provided his consent, Detective Anderson took a DNA sample from Davis and asked Davis if he could photograph his hand. After Davis consented to having his hand photographed, Detective Anderson took a photograph of Davis's hand. At the suppression hearing, Davis testified that he did not want to consent to giving his DNA or allowing the detectives to photograph his hand, but he consented because he "was tired," and giving his consent "was the only way to get away from all of the questions."[7] (Transcript, D.E. 205, 180: 1-12.)

---

[7] The testimony regarding Davis's consent is as follows:

Q. Why did you say yes?

A. I give in. I was tired. That was the only way to get away from all the questions, to get them to leave me alone. They take me to the jailhouse. I know they wasn't gonna come in the jailhouse and ask me anymore questions.

Q. When you said yes, did you want to give them your DNA?

**II.     Report and Objections**

Davis moved to suppress the statements he gave to law enforcement officers during his post-arrest interview, the DNA sample, and the photograph of his hand. The Government conceded that the statements were taken in violation of Davis's Miranda rights, but argued that the statements were made voluntarily. After finding that Davis's testimony was not credible, and considering other factors including Davis's education, mental abilities, and his allegations of fatigue and marijuana use prior to the interview, the Magistrate Judge concluded that Davis's statements were made voluntarily, and recommended that the Court deny Davis's Motion to Suppress Statements. (Report 12-15.) The Magistrate Judge also found that Davis voluntarily consented to providing the DNA sample and having his hand photographed, and further found that even if Davis had not consented, the evidence should not be suppressed under the inevitable discovery doctrine. (Id. at 15-20.)

Davis filed the following six objections to the Report: (1) Davis disputes the identification of him from the surveillance videos from the Broward jewelry store robbery made by Michael Martin; (2) the detectives gave differing reasons for violating Davis's

---

    A.     No.

    Q.     Did you want them to take a photograph of your hand?

    A.     No.

    Q.     What did you think would happen to you if you said no again?

    A.     I would sit there for hours again until I give them my DNA.

(Transcript, D.E. 205, at 180:1-12.)

Miranda rights; (3) Davis was threatened by the detectives during the interview; (4) the detectives used psychological coercion against Davis during the interview; (5) Davis consented to providing his DNA only because he believed the detectives would continue to interview him rather than take him to the county jail; and (6) the doctrine of inevitable discovery is not applicable to the DNA collection in this case. (See Objections 2-8.)

In response, the Government first contends that the identification by Michael Martin is irrelevant because Martin's other statements provided sufficient probable cause to obtain an arrest warrant. (Response to Objections 1.) The Government also argues that the detectives' reasons for violating Davis's Miranda rights is irrelevant because the Government has conceded the violation and because the violation of Davis's Miranda rights does not vitiate his consent to a search. (Id. at 1-2 (citing Smith v. Wainwright, 581 F.2d 1149 (5th Cir. 1978); United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993)).) Moreover, the Government asserts that the transcript of the suppression hearing adequately supports the Magistrate Judge's factual findings including his credibility determinations and argues that the detectives did not threaten or use psychological coercion against Davis and that Davis voluntarily gave his consent for the detectives to obtain his DNA and photograph his hand. (Id. at 3-7.) Finally, the Government argues that the doctrine of inevitable discovery applies because had Davis not provided his consent, the detectives would have obtained a search warrant for his DNA. (Id. at 7-11.)

### III. Standard of Review

Pursuant to Rule 59(b)(3) of the Federal Rules of Criminal Procedure and 28 U.S.C.

8

§ 636(b)(1)(B), the Court must consider <u>de novo</u> Defendant's objections to the Report and "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter." In making its determination, the district court is given discretion and "is generally free to employ the magistrate judge's findings to the extent that it sees fit." <u>Amlong & Amlong, P.A. v. Denny's, Inc.</u>, 500 F.3d 1230, 1245 (11th Cir. 2007). To the extent the magistrate judge's findings turn on evaluations of credibility or "demeanor-intensive fact finding," those findings should not be rejected or overruled lightly as "the raw transcript of the hearing" does not capture the "nuances of the testimony or the demeanor of the witnesses." <u>Id.</u> at 1248-50.

## IV. Discussion

### A. Statements

Reviewing the record and arguments <u>de novo</u>, the Court must determine whether Davis made his statements voluntarily.[8] A defendant's statement to authorities is voluntary if it is "the product of a rational intellect and a free will." <u>Mincey v. Arizona</u>, 437 U.S. 385, 398 (1978). To determine whether a statement is voluntary, the court must assess "the

---

[8] The Government has repeatedly stated that it concedes the violation of Davis's <u>Miranda</u> rights and does not intend to use Davis's statements from his post-arrest interview in its case-in-chief. (<u>See</u> Response to Objections 2; Amended Response to Motion to Suppress Statements, D.E. 143, at 1.) The Government, however, has stated that it intends to use the statements for impeachment purposes if Davis elects to take the stand. (<u>See</u> Amended Response to Motion to Suppress Statements 1.) "So long as they are voluntary, statements obtained in violation of a defendant's Fifth or Sixth Amendment right to counsel cannot be used in the prosecution's case-in-chief against the defendant, but may be used for impeachment purposes." <u>McGriff v. Dep't of Corrections</u>, 338 F.3d 1231, 1236 (11th Cir. 2003) (citing <u>Michigan v. Harvey</u>, 494 U.S. 344, 351-52 (1990); <u>Harris v. New York</u>, 401 U.S. 222, 225-26 (1971)).

9

totality of the circumstances, including the details of the interrogation and the defendant's characteristics." United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). In particular, the Court "focuses on whether the police overreached, considering factors such as the accused's lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Id.

Davis argues that his statements were coerced for three reasons: (1) Detective de la Paz told him he would serve twenty-five years in prison if he was convicted; (2) Detective Anderson threatened that Davis would by anally raped in prison when he said that Davis's cell mate would "punk your ass out"; and (3) Detective Anderson impersonated Davis's mother, which was a form of psychological coercion to which Davis was particularly susceptible. (Objections 3-4.) First, regarding the detective's statement about Davis's potential sentence, "discussions of realistic penalties . . . are normally insufficient to preclude free choice." United States v. Quinn, 123 F.3d 1415, 1424 (11th Cir. 1997). Davis was detained and questioned on his involvement in two robberies and was subsequently charged with multiple counts of Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, and possession of a firearm in furtherance of a crime of violence. (See Superseding Indictment, D.E. 39.) The robbery and conspiracy counts both carry a penalty of twenty years imprisonment; thus, the detective's statement that Davis could serve twenty-five years in prison was a realistic assessment. (See Penalty Sheet, D.E. 55-1, at 2; see also 18 U.S.C. §

1951(a).)

Second, regarding the phrase "punk your ass out," although Davis testified that he understood Detective Anderson to mean that Davis's cell mate would anally rape him in prison, Detective Anderson testified that he meant that Davis would be required to make certain concessions – such as giving up his lunch or telephone time – to his cell mate. The Magistrate Judge found Detective Anderson's testimony credible and Davis's testimony incredible, noting that Davis testified inconsistently on other matters during the suppression hearing. (Report 8 n.6.) To the extent the Magistrate Judge's findings hinge on credibility determinations, they should not be cast aside lightly. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (stating that credibility determinations are within the province of the fact-finder and should not be disturbed). Upon review of the transcript, the Court finds the Magistrate Judge's factual findings and credibility determinations are adequately supported by the record and should not be disturbed.

Finally, Davis points to evidence from a forensic psychologist regarding his verbal comprehension and argues that he was unable to withstand Detective Anderson's interview technique of impersonating Davis's mother. (Objections 4.) The Magistrate Judge considered the forensic psychologist's opinion that Davis suffers from a verbal learning disability, but after listening to Davis testify and watching the post-arrest interview, the Magistrate Judge found that Davis "had no difficulty responding to the detectives' verbal inquiries at his post-arrest interview and testifying at the suppression hearing in the instant case." (Report 14; see also Report 11 n.10.) Upon review of the transcript, the Court finds

the Magistrate Judge's factual findings and credibility determinations are adequately supported by the record and should not be disturbed. Furthermore, although Davis argues that he was "particularly susceptible to this type of coercion," the Court notes that Detective Anderson's attempt to obtain Davis's consent to provide a DNA sample by impersonating his mother was not successful, as Davis again refused to provide his DNA. (See Transcript, D.E. 183-1, at 36:11-37:6.) Accordingly, the Court finds that the record supports the Magistrate Judge's conclusion that Davis's post-arrest statements to law enforcement were made knowingly and voluntarily.

**B.    Physical Evidence**

Reviewing the record and arguments de novo, the Court must determine whether Davis gave his consent to search freely and without coercion. "[A] search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." Id. "A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice." United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004). "Voluntariness is a question of fact based on the totality of the circumstances." Id. "In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse

consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001). During a police interview, the "failure to cease questioning [after the defendant invokes his right to have an attorney present is] a factor to be considered in the totality of the circumstances." Smith v. Wainwright, 581 F.2d 1149, 1152 (5th Cir. 1978). The government bears the burden of proving the existence and voluntariness of the consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995).

Davis argues that his consent to provide his DNA and allow the detectives to photograph his hand was coerced and involuntary because he was tired and he believed that, if he continued to refuse, the detectives would not take him to jail. (Objections 4-5.) The Magistrate Judge specifically considered these claims and did not find Davis's testimony regarding his reasons for consenting to provide a DNA sample credible. (Report 10 n.9.) After listening to Davis's testimony at the suppression hearing and his post-arrest statements, and considering other circumstances including Davis's education and mental abilities, the Magistrate Judge concluded that Davis understood the consent form he signed that allowed the detectives to take a DNA sample from him. The Magistrate Judge was "not persuaded by [the forensic psychologist's] testimony regarding the defendant's ability to understand the consent form" for three reasons: (1) "the defendant knew the information he provided to [the forensic psychologist] would be conveyed to his defense attorney and to the Court," (2) "the defendant had no difficulty responding to questions and communicating information on both

direct and cross-examination" at the suppression hearing, and (3) "the defendant appeared to understand the concept of DNA sampling when the issue was discussed in his videotaped/recorded interview with law enforcement." (Report 11 n.10.)  Upon review of the transcript, the Court finds the Magistrate Judge's factual findings and credibility determinations are adequately supported by the record and should not be disturbed.

In addition, Davis argues that the Magistrate Judge erroneously relied on United States v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993).  In Hidalgo, the Eleventh Circuit found that the defendant's consent to a search was valid even though it was obtained after the law enforcement officers read the defendant his Miranda rights and the defendant had invoked his right to remain silent.  The Magistrate Judge cited to this case to support his conclusion that "the fact that the detectives violated the defendant's Miranda rights during the post-arrest interview does not invalidate the defendant's subsequent consent to provide the DNA sample or his verbal consent to the photograph." (Report 17.)  Davis contends that this case differs from the facts in Hidalgo because here, the "repeated violation of those rights contributed to the coercion that persisted for hours." (Objections 5 n.3 (emphasis in original).)  This "failure to cease questioning [is] a factor to be considered in the totality of the circumstances."  Smith, 581 F.2d at 1152.  The Court finds that despite the officers' continued questioning and requests for a DNA sample after Davis invoked his right to an attorney, the totality of the circumstances outlined above – including the Magistrate Judge's credibility determinations regarding the testimony of Davis and the forensic psychologist and the lack of any threats by law enforcement – show that Davis voluntarily provided his

14

consent to the search.[9]

V.  **Conclusion**

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. Consistent with this Order, the Report and Recommendation of the Magistrate Judge (D.E. 208), issued on September 30, 2011, is **ADOPTED**;

2. Defendant's Motion to Suppress Statements (D.E. 125), filed on June 1, 2011, is **DENIED**;

3. Defendant's Motion to Suppress Physical Evidence (D.E. 126), filed on June 1, 2011, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 9th day of January, 2012.

                                                                              _____
                                                                              **JOAN A. LENARD**
                                                                              **UNITED STATES DISTRICT JUDGE**

---

[9] Because the Court finds that Davis voluntarily consented to the search, the Court need not address the inevitable discovery doctrine. The Court has also considered Davis's first two objections – regarding the identification of Davis on the surveillance video by Michael Martin and the reasons the detectives gave for violating Davis's Miranda rights – and finds them irrelevant to the Court's conclusions on the Motions.